The next case for today is case number 415-0045, and that case is People of the State of Illinois v. Lafayette-Harper. And for the appellant and the counsel, I'm going to ask you to say your name for me. Michael Gentithes, I'm happy to help. Thank you, Mr. Gentithes. And then for the appellee, we have Ms. McClain. You may proceed, counsel. Good morning, Your Honors. Michael Gentithes on behalf of the appellant Lafayette-Harper. The State premised a flawed prosecution of Lafayette upon conjecture that because his cousin Davion was involved in the death of Tim Schuetz, Lafayette must have been too. That conjecture led to a deeply flawed eyewitness identification that was based more on public rumor than on any facts of the case or actual recollection of the offender. Not only did the State thereby fail to prove Lafayette guilty beyond a reasonable doubt, in its effort to do so, it introduced multiple reversible evidentiary errors, it destroyed potentially exculpatory evidence, and it permitted Lafayette to unknowingly forego his full jury trial rights. For all of these reasons, Lafayette's conviction cannot stand. I plan this morning to focus primarily on the evidentiary and jury trial issues, though I'm happy to answer any questions Your Honors might have about any of the issues raised in the brief. To buttress a weak case, the State introduced text messages that had no foundation to contain two levels of inadmissible hearsay, and did all of this contrary to an on-the-record agreement that both the State and the Court had acknowledged prior to Lafayette opening his case in defense. Now, the State offered evolving justifications for what was to be Exhibit 50, saying at first that this would demonstrate contacts between Davion and Lafayette, later saying that although the full records had to be produced, not all of those text messages would be put before the jury's eyes, before finally emphasizing in closing arguments that the jury would receive the full phone records contained in Exhibit 50 that included these text messages. Not only was there no foundation to establish that Lafayette had anything to do with the sending or receiving of these text messages, they contained two levels of inadmissible hearsay, an unknown declarant asserting that further unknown declarants had heard rumors that Lafayette had something to do with a white boy getting killed in late October of 2009. This was all introduced in contrast to a promise the State had made on the record prior to trial. Both the State and the Court, until the morning Lafayette opened his case, assured him that the jury was never going to see these text messages. The introduction of them violated Lafayette's Sixth Amendment rights. This was not a case where the evidence was otherwise strong against Lafayette. In fact, the evidence was so weak that the State failed to prove him guilty beyond a reasonable doubt. The only eyewitness to the crime, Randall Smalley, was unable to identify Lafayette two days later in a photo array. He admitted repeatedly that he didn't see the offender's face above the car. He attempted to make this identification in Pitch Black Elmwood Park in late October. He had no opportunity to observe the offender in the backseat of the car while a 350-pound Davion Harper held him in a headlock, pointed a gun to his side, and threatened to kill him if he moved. The only identification Smalley ever made in this case came seven months after the incident, when, at the behest of unknown others in the community, he looked Lafayette up online, simply because he was related to Davion. The State not only failed to prove Lafayette guilty beyond a reasonable doubt, but in its zealous effort to do so, introduced these text messages that prejudiced Lafayette's constitutional rights and required reversal. The State then went further. It undermined Lafayette's due process rights by destroying a car that contained potentially exculpatory evidence. This car was destroyed in bad faith, 11 months after Lafayette had requested its preservation during discovery. Now, I thought Mr. Harper's defense attorney said she was not suggesting there was bad faith. At trial, this was raised as an Illinois constitutional issue under Newberry. However, that doesn't preclude this Court from examining both bad faith and the Newberry strain of cases that requires preservation of evidence essential to and determinative of the outcome of a case. Because the same essential claim was raised below, all the facts are of record, this Court can still address both the bad faith argument and the Newberry argument under the Heider case. Now, as for the State's claim that somehow police procedures could trump Lafayette's constitutional rights, that simply doesn't hold. Police procedures to stop and frisk suspects can't trump constitutional rights. Or for instance, in the Nunn case cited in the briefs, police procedures cannot allow the officers to delete cell phone video of a bad arrest, simply because that's according to their normal process. Counsel, what is the evidence that points to bad faith? That Lafayette requested that all tangible objects the prosecution intends to use at trial be preserved in December of 2010, yet the State destroyed them. Where was the use of the word preserved? In what motion? I'm sorry? Where was the use of the word preserved? I'm sorry, I may have misspoken. That all tangible objects the prosecution intends to use at trial be reduced. Was the vehicle used at trial? The fingerprints taken therefrom were used and repeatedly emphasized by the State throughout trial. And those were preserved? Fingerprint cards taken from the car were preserved, but that doesn't preclude finding other evidence pointing to the true identity of the offender here. No evidence collector is perfect. There could have been further fingerprints collected from the exterior or interior of the car. There could have been further biological evidence pointing to the true identity of the offender. And again, the evidence the State harps on repeatedly here, the fingerprints taken from the car door, not only did they repeatedly emphasize this, they shifted the burden during rebuttal closing argument by focusing on the fact that Lafayette had not produced evidence he was previously in the car. Well, counsel, I know that the request was to preserve, well, to not destroy any tangible objects, but the vehicle wasn't specifically mentioned. Is that right in the discovery request? That's correct. Other than the fact that it is a tangible object, I understand that. And then it was 11 months before the vehicle was crushed, right? That's also correct. So I'm still struggling to identify what demonstrates bad faith. This discovery request was sufficient to trigger to a reasonably prudent officer or a reasonably prudent prosecutor's office the knowledge that Lafayette wanted to inspect this vehicle. In fact, he discovered the destruction of the vehicle after his inspector attempted to obtain it. So is your position that if a request is made to not destroy something and it is destroyed, then it is automatically bad faith? If that is an item that is in the control of the prosecutor in the police department and it's an item that they are on notice, ought to have been preserved for Lafayette's inspection, for the defendant's inspection. Now, Lafayette's constitutional rights under the Illinois Constitution were also violated by the destruction of this car, and that does not require bad faith. Under the Newbery case, evidence that's essential to and determinative of the outcome of the case must also be preserved. And here, this was the key source of the state's fingerprint evidence. Is Newbery still good law? It is. It's been called into question under Fisher v. Illinois in the U.S. Supreme Court, but the Illinois Supreme Court has not seen fit to reverse it. Furthermore, other state courts outside of Illinois have also seen to preserve a similar rule under similar circumstances. And Newbery remains on the books, good law, in Illinois. And here, the car issue. There's also another maxim, which is you cannot raise on appeal an issue that you conceded in the trial court. And in this case, the defense attorney said, we're not alleging bad faith. Irrespective of the bad faith argument, the Newbery strain still holds. That's been alleged throughout the trial process. How is the car outcome determinative? Because it is the source. As opposed to the cases where it was cocaine and the product is destroyed, that is the crux of the case. The car here is equally important to the prosecution. It is the fulcrum of their argument to the jury that Lafayette left fingerprints on the door handle that the offender also touched is what they harped on again and again and again. Well, that was preserved. The fingerprints were preserved. And your client was able to have them retested if he so chose, right? The fingerprints the state collected were preserved. But again, that doesn't preclude the possibility of Lafayette's independent inspection of the car producing other fingerprints or other biological evidence that would have pointed to the identity of the true offender. And furthermore, when the state is arguing about the fingerprints again and again, it goes beyond simply noting that these point towards Lafayette. It suggests that Lafayette should have shown he was in the car sometime in the previous six months. Lafayette made the argument based upon expert testimony at trial that this fingerprint could have been left any time in the previous six months. Didn't the state just say there was no evidence that he'd ever been in the car before? That takes the state's statement a bit out of context. The state remarks that Lafayette has argued that he could have left this fingerprint sometime in the prior six months, but there is no evidence he was in the car. Wasn't that a true statement? Was there any evidence that he'd been in the car prior? No, and Lafayette was not required to produce any such evidence. I'm saying he was required to produce it, but isn't that a correct comment by the state? That Lafayette was not in the car according to the evidence? The prosecutor didn't say the defendant failed to produce any evidence he'd been in the car. His attorney argued he could have left that print any time they were related. It could have been there six months earlier. And then the prosecutor says there's no evidence that he was ever in that car or touched that door handle before. And that, based on the record, is correct. But Lafayette's argument cannot invite that kind of error. It cannot invite a shifting of the burden. How does it shift the burden? Because it suggests to the jury, when taken in context, Lafayette says he may have made this mark sometime in the prior six months, but there's no evidence that he did. That suggests Lafayette had a burden to produce such evidence. The state's making that comment in rebuttal closing argument when Lafayette has no opportunity to respond. And it's making that argument while knowing full well that the only source of contrary evidence, the car itself, has been destroyed. That amounts to prosecutorial misconduct and reversible error in this case. Now, beyond these evidentiary errors, Lafayette also made an unknowing waiver of his full jury trial rights. The right to a jury of 12 peers from the community is an essential feature of a substantial Illinois constitutional guarantee. Statutorily, we require written waivers of jury trial rights. Yet here, the circuit court accepted an unwritten waiver that relied entirely upon defense counsel to explain all the strategic reasons that Lafayette might choose a jury of 12 versus a jury of six. We cannot simply assume that Lafayette, who has never had a jury trial previously, understands all the strategy that might be involved here, all the differences and nuances that are so important for a defendant to grasp. There's no proof Lafayette acquiesced to a jury of less than six where there's no proof that he understood the right at issue. You cannot acquiesce to something you do not understand. And Lafayette needed to know that it's more difficult for a jury of 12 to reach a unanimous verdict, that a jury of 12 is more likely to take a broad and diverse swath of the community and enhance its deliberations, which is so important in a close case like this. Or, for instance, that a jury of 12 makes it more likely for a dissenter to find an ally and thereby withstand the peer pressure of the remaining jurors. Are you saying that it was the obligation of the trial court to admonish him as to the things you're referring to? Lafayette needed to understand the distinctions between a jury of 12 and six. Those distinctions, which the Illinois appellate court has acknowledged in the Jones case, are part of that. Are they part of any required admonishment? They should be a part of admonishments given by the Supreme Court. I didn't say should be, but are they? There's no Illinois case law detailing the requirement of admonishments, what exactly must be included to go from 12 to six. What the Matthews case suggests is that we cannot simply rely upon defense counsel to explain the right at issue. And that's what the trial court did here. They took Lafayette's word that he's spoken to counsel and counsel's answered any questions he may have as sufficient to explain all the rights at issue. And that's without an explanation of the role of the jury in general, even before you get to the distinctions between 12 and six. Because this is an analogous situation to Matthews, this amounted to reversible error as well. To buttress a weak case, the state also used inadmissible hearsay evidence from Davion. There was no proof that Davion and Lafayette had met previous to this night in October to conspire in some way, to hatch a plan, a scheme, to rob Tim Schutz of $3,500. And the state contradictorily argues that it needs these statements from Davion to prove Lafayette's guilt. Yet it can already prove his identity as the offender so clearly as to establish a prima facie case of conspiracy. We know from the Duckworth case that a mere familial relationship between a defendant and another one on the scene of the crime does not alone establish a prima facie case of conspiracy. What are the statements that Davion made that should not have come in? Statements made in the car where he had a conversation on his cell phone. So during the actual commission of the crime? Yes. Oh, you're talking about the cell phone call prior to the crime. This is the cell phone call as the parties are driving to Elmwood Park where he discusses the amount, discusses who has the money with an unidentified third party which establishes a plan, establishes that this was not a whim. How about the tie-in then between the number of cell phone calls between Davion's phone and Lafayette Harper's phone? That alone doesn't establish a conspiracy to rob Tim Schutz. Lafayette and Davion are cousins. There's no doubt that they're in contact frequently. But is that an inference that can be drawn? I mean, they have these calls between their cell phones? And it's actually during the commission of the offense or immediately prior to and then afterwards. That does not establish the pre-planned conspiracy to rob Tim Schutz. It's not prima facie proof that Lafayette and Davion reached a meeting of the minds at some time prior that they were going to take money from Tim Schutz. How about the fact that when the back door opens that he's ready to kill the front passenger or at least hold him with a gun and say, so it's obvious he knows something's going to happen. That's certainly clear that Davion knows something is going to happen. But the proof that that third party is Lafayette, again, is extremely tenuous here. The only eyewitness identification we have comes seven months later after a failure. They have a fingerprint on the door handle and you have like seven or eleven calls between their cell phones in and around the time of the actual crime. There's a single fingerprint left on the rear door handle that's attributable to Lafayette. This could have been made according to expert testimony any time in the prior six months. And there's no disputing. It's two of off fingerprints, so. Absolutely. And there's no reason to doubt that these two are close cousins, that they would have been in contact previously. Furthermore. But counsel, I mean, you know, we rarely have direct evidence of a conspiracy. You don't have people saying, yes, we agreed to do this. That's rare. And so we have to look at inferences to be drawn from the evidence. And while what you're suggesting is an inference, isn't it for the jury to decide what inference they want to draw, as long as that's a reasonable inference to be drawn? Not on the admission of Davion statements. That is a judgment call. But no, I'm talking about your suggestion that there is no evidence of a conspiracy. Again, the prima facie case of a conspiracy has to be demonstrated to the trial judge to open the door to Davion statements coming in at all. And the proof that the state is saying is so much a slam dunk was not sufficient to establish that prima facie case. And thus, Davion statements were improperly admitted requiring reversal as well. If there are no further questions from the court. I don't see any. Thank you, counsel. Thank you. Ms. McClain. May it please the court, counsel. The state is responding to the arguments my opponent raised. As for reasonable doubt, there was a positive identification in this case. Any flaws affected the weight. And every point defense counsel makes was made below so that the jury could assess the flaws in the identification. And still they found beyond reasonable doubt that the defendant was guilty of murder. In addition to the positive identification, there was defendant's connection to defendant. They were cousins who called each other brother. There were many calls and texts around the time of the shooting.  And five of them clustered right around the time of the shooting. Defendant's right thumbprint was on the door handle where Tim Schutz sat and the door was open to shoot him. Defendant's possible DNA was on the backpack that they wrestled over. And also there was evidence that defendant bought shotgun shells from a co-worker a month prior to the offense. So all that evidence was presented to the jury and the jury found defendant guilty. As for the six-person jury, this issue has been waived where it was invited by defendant and he did not include it in his post-trial motion. Plain error does not apply to an affirmative acquiesce. In this case, defense counsel represented to the court that defendant had made the decision to select a panel of six jurors rather than a panel of 12. After swearing in the defendant, the court asked defendant if it was correct and was it his intention that he proceed with a six-panel jury rather than the customary 12-panel jury. So we have defense counsel not only stating in defendant's presence that defendant desired to proceed with a six-person jury and defendant did not object to his state, he did not understand. Defense counsel stated he had consulted with defendant, implying that defendant actively participated in the decision and then the court personally inquired of defendant. All that went together to show on the record that defendant understandingly and expressly waived his right to a 12-person jury. As for the text message evidence, this issue is forfeited. During trial when the court ruled on the invisibility of people's exhibit number 50, defense counsel's only objection was foundation. At this point, the prosecutor had already made the statement in the motion limiting hearing about the jury not getting to see the text messages, so defense counsel could have made that objection at this time but did not. Subsequently, when the court was ruling on whether the exhibit number 50 would go back to the jury, defense counsel added that objections on the grounds of hearsay and agreement by the state not to admit text messages. That was too late. In addition... I mean, the court had the opportunity to address it at that point, right? The court could address it, but it had already been admitted, so it's already in evidence. Perhaps the court could have retracted, I guess. Is there anything suggesting the court couldn't change its mind? I mean, we had some mind changes in this case. Is there any reason the court couldn't have changed its mind? I think the court could have changed its mind. However, those objections should have been made at the first possible moment, not toward the end of the case. Well, they were handled in the motion limiting. Pardon me? The defense counsel made those objections during the hearing on the motion in limiting or prior to trial. She pointed out to the trial court that these were hearsay, the content of the text messages were hearsay and not admissible. I think she didn't make that objection until they were ruling on whether the exhibit would go back to the jury at the end of trial. No, no. Well, I recall it differently. But at any rate, I mean, we normally have a situation where it's just not raised at all and then we're hesitant to rule on the issue because the trial court didn't have the opportunity to address it and potentially correct it. But that's not the case here, right? I do believe that they did make a hearsay objection toward the end of trial. But by then the... Had the jury seen the text messages at that point? No. As for whether the state promised that the text messages would never be seen by the jury, the court actually ruled on this and found that the state had not made any promises, that it was offhand or jerk response to a statement made by defense counsel. In addressing the independent evidence of conspiracy, defense counsel went through the state's evidence and said, the jury's never going to see these text messages. And then when making her argument, the prosecutor stated, in this case we plan on presenting, and I know the text messages are not going to come in, but there is evidence of telephone contact. They were addressing co-conspiracy exception to the hearsay rule. They weren't addressing whether the text messages would come in. This was just a jerk response to something defense counsel said, and the court found that this was an offhand remark or jerk response, not in agreement by the parties. As for the foundation of the text messages, they were properly authenticated as being sent to or from defendant or someone on his behalf. The Verizon employee testified that the cell number was assigned to the account bearing defendant's name, and Detective Bransford testified that the defendant gave that phone number as his own. The state could rely on that. Who sent the text messages to him that said, the word on the street is, you killed a white boy? Who sent that text message to LaFayette Harper's phone? I don't think it was, I think it might have been a girlfriend or something, but I'm not positive. Was there any testimony about who sent that? No. No, there was no testimony. It was not argued before the jury. There was no testimony regarding specific text messages at all. Well, what if you had a person sitting live in the courtroom on a witness stand? Would the state be allowed to say, tell me what you heard about this on the street? No, I do not believe that. So then how were these text messages admissible? I think that they were admissible to show contact or lack of contact between defendant and Davion. How does this unknown third party text establish contact between the defendant and Davion? It shows that during that 24-hour period that the text messages, I'm not exactly sure what the length of period covered in the document is, but during that period there's like 11 text messages total between defendant and Davion. They're scattered throughout. Are you suggesting that this is a text message between defendant and Davion, the one about what was heard on the street? No, I'm not suggesting that. So then how does it establish contact between Davion and LaFayette? That's the question. That's what you argued in your brief, and I'm failing to see how that is relevant at all to that issue. The document shows overall a lack of contact between Davion and defendant except for that five text messages during that relevant time period. But I guess I'm beating a dead horse. This third party text message to LaFayette has no connection to Davion as far as we know because, first of all, the state never established who sent it. But as I said, even if they did establish, how does somebody saying, I heard on the street you killed a white boy, and the response back isn't incriminating. It's like, what? What are you talking about? That's not incriminating. So how does that whole conversation get into the jury? I think it came in in the document, rather than presenting it piecemeal and just showing the five calls at the time period, they showed a period of 24 hours and the lack of contact between Davion and defendant except for right at the time of the shooting. It's relevant to show that defendant and Davion are doing something together. Well, the phone records might be the log of the calls back and forth. And I think defense counsel basically conceded she didn't have any objection if it was just a log of the calls. She was talking specifically about the content of the text messages. Well, if you look at that exact text message, the one that they're talking about, that was just a, hey, I heard. And he expressed a surprise. You know, like, what? It's like, not me. There's nothing incriminating on his part. But it gets in front of the jury that people on the street have already heard that Lafayette's involved. So obviously, if I'm a juror sitting there, that's the word on the street. So people already knew. Now, they're not entitled to hear that, right? Ordinarily, you couldn't have a witness come in and say, so how can you get it in through a text message from an unknown person? I think that the document would have not been proper if it was admitted in piecemeal fashion. I think that the text message in particular does not, it's questions. It's a question. It is not. It's not an affirmative, hey, you killed that kid, you know? Who cares what it says? How does it come in? It's an out-of-court statement, right? It's hearsay. On what exception does that come in? I think it came in with the rest of the text messages and calls under the business exception to the hearsay rule. Well, the business record portion of the text exception is that the number that's being used is Lafayette Harper's, and these calls from these other numbers are coming in. That's the type of record that the phone company keeps. The phone company also kept this text message. Right, but they don't create it or do anything with it. In other words, just because they might get some hearsay statement, that doesn't convert it to their business record. Their business record is the times, the calls, the length of the call, that type of thing. Because they have no knowledge as to the accuracy of the statement. How could that be their business record? There is a case in my brief, I can't remember the name of it, but it talked about how something came in. Davis, 4th District from 2014. A text message requesting drugs was introduced for a non-hearsay purpose, circumstantial evidence to defend its drug dealing, and not to prove the truth of the matter that the sender wanted drugs. In that case, I can't recall, but I believe the defendant admitted receiving the text message and being knowledgeable of it and saying he knew who it came from. Basically, the defendant confessed, yeah, we sent these messages and that's true and it came from so and so. We don't have that here. I don't know specifically more than what I just said on the Davis case. I'm sorry. I would merely assert that it was not offered to prove the matter asserted, that it was not hearsay, and that it was more of an accusation. What's the relevance then? Pardon me? What's the relevance? The relevance is that it shows contact or not contact. Between who? Some unknown person and Lafayette. How is that relevant? It shows no contact at that point between Davion and the defendant and then a cluster of contact right at the time of the shooting. But you could show that with just the phone numbers, couldn't you? You didn't need the contact. Possibly. I would argue that this was a minimal part of the evidence. In this case, we had a positive identification by defendant. We had the thumbprint on the back door. We had the DNA, possible DNA, on the backpack. We had the text messages back and forth apart from the statement by the him getting shotgun shells a month before. So even if there was error in this one little text message that was not highlighted to the jury in the evidence or during closing arguments, the outcome would not have been different had that not been there. As for the statements by co-defendant Davion, under the co-conspirator exception to the hearsay rule, there was adequate evidence of conspiracy in this case. Co-defendant Davion received text messages from a cell phone registered to defendant right before defendant ripped open the back door of the car. Defendant opening the car door and rustling with shoes, koi pinning, shooting and moving the allowable evidence over the bag of money after Davion drove to the location where the drug deal was to occur was evidence of conspiracy. Then while defendant was rustling with shoots for the bag of money, co-defendant pointed the gun at Smalley and told him if he moved, he was dangerously dead. Defendant and co-defendant conversed outside the vehicle after the shooting. The shotgun defendant used in the shooting was found in a side yard and defendants, um, um, defendants, uh, oh, Davion disposed, they both disposed of their guns. Davion's right thumb print was on the rear passenger door handle and a mixture of DNA profiles was identified as present on the backpack. Um, there's plenty of evidence of conspiracy in this case and that that evidence was not admitted in air. In addition, all the information in the conversation, including where they were going, that they were conducting a drug deal and that they would ride together in Davion's car was apparent from other evidence in the case and defendant was not named or identified during any of the hearsay statements. As for, um, the disposal of the vehicle, um, defense counsel, um, asserted below that I don't think there was bad faith on the part of the police department. Therefore, um, the state is arguing that the bad faith, um, federal due process argument has been waived. In addition, the police followed procedures, um, and the fact that they followed procedures can be examined to determine whether there was bad faith. Um, in contrast, in the Nunn case cited by my opponent, there was no testimony regarding police normal procedures. Um, there was no indication the police knew that the vehicle would be used at trial or was necessary evidence and the evidence collected from the vehicle, including 17 fingerprint cards with multiple fingerprints on each card and DNA, which was identified as the victim's, was probably properly preserved and made available to defend it, but he did not retest anything or ask for, um, you know, expert or bring experts forward. But what about opposing counsel's point that this precluded the defendant from testing to see if there were many other, I guess I should say swiping or wiping to determine if there were other fingerprints on the vehicle or any other evidence within the vehicle that would assist the defendant in proving his innocence? I think that the, the police car or the police had, uh, completely, um. Is that their determination to make for him? He did not ask that the police car or the car be, um, preserved. It was just a general discovery request for evidence used in the, to be used at trial. The car was not used at trial. Only the fingerprints were. So the discovery request was not for the car. He did not ask that the car be preserved so that he could examine it. So it's your position he would have had to specifically ask that the vehicle itself be preserved, that referring to tangible objects is not sufficient? I think that's one of the considerations in, um, that this court should look at is whether he made a specific request for the car. And he did not in this case. So it's kind of like the Sutherland case where they found Newberry was inapplicable, where the vehicle did not constitute the very basis of the case. The evidence removed from the vehicle was still available to the defendant and there was no specific discovery request. So that Sutherland, um, 2006 case from the Supreme Court I think would be applicable. Um, if there are no other questions. I don't see any at this time. Thank you. Any rebuttal, Mr. Gentithis? Thank you. Thank you. I wrote it down phonetically. Your Honor, just a few points. I'll focus primarily on the text messages. The state wants to harp on these messages as proof of Lafayette's guilt, but they offer no substantive response to the double hearsay that these messages contain. This wasn't a forfeited issue, um, to Justice Pope's point. I'll point to volume 28, page 354 of the record where defense counsel notes as identified, there are text messages within those phone records. And I believe those are hearsay. To the extent that there was any, uh, failing, uh, defense counsel to raise all of the arguments against these text messages, that's attributable to the fact that both the state and the court assured her prior to opening her case that these messages weren't going to be put before the jury's eyes. Relying on those assurances, she didn't feel the need to explain all the blatant errors in admitting such messages. And again, this is the same essential claim that was raised below. All the facts are developed. This court can review the issue based on the record that we have. To Justice Pope's point, there's no proof of who sent these messages. That is a missing foundation. And it also establishes two layers of hearsay. The business records exception only applies to establishing that these Exhibit 50 is in fact what the employees of the cell phone company reported to be. It does not cover the unknown declarant asserting what other unknown declarants have told him or her. There is absolutely no proof at trial who this declarant was. Uh, there's no suggestion that it could have been a girlfriend. Nothing at trial establishes any relevance to these text messages. And that really distinguishes this case from Davis. There, as Justice Holder White pointed out, we have a defendant who's essentially acknowledging the foundation for the case. Furthermore, those texts are introduced not for the truth of the matter they assert, but to establish that the defendant is involved in drug deals, not that someone sending messages actually wants to acquire drugs. Here, there's no justification offered by the state for the content of these messages. The jury can only take them for the truth that they asserted that Lafayette had something to do with this crime. And this is not harmless beyond a reasonable doubt in an extremely close case. Again, the other evidence against Lafayette including a deeply flawed eyewitness identification, a single fingerprint that could have been left any time in the prior six months, DNA evidence on a backpack that was one of three different profiles found on the backpack and would have been found in one of four black men. No DNA was found in the victim's fingerprints that would have pointed to Lafayette. This was an extremely close case. And these text messages were prejudicial and require reversal. One quick note as well regarding the destruction of the car. Again, this discovery request for all tangible items was specific enough to notify a reasonably prudent officer, a reasonably prudent prosecutor of the need to not destroy a vehicle before Lafayette has the opportunity to inspect it. And the Danville Police Department's actions suggest that they understood just how important this car was. They had it towed to their headquarters. They had it examined thoroughly for evidence and they kept it for over a year. But they destroyed it before Lafayette had the chance to examine it and in so doing committed reversible error. Are there no further questions? I don't see any at this time. Lafayette asks that this court reverse this conviction outright or reverse and remand it for a new trial. We'll take this matter under advisement and be in recess until the next meeting.